UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RICHARD KRAFT,                              :        ECF CASE
                                            :
                                            :
                   Plaintiff,               :
                                            :        No.: _____
                                            :
          v.                                :
                                            :        COMPLAINT
                                            :
COMPUCOM SYSTEMS, INC.,                     :
                                            :        JURY TRIAL DEMANDED
                   Defendant.               :
                                            :
                                            :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NATURE OF CASE

1.      Plaintiff Richard Kraft ("Mr. Kraft") alleges claims of unpaid commissions

under the New York Labor Law and breach of contract, unjust enrichment and quantum

meruit under New York common law against his former employer, Defendant, CompuCom

Systems, Inc. ("CompuCom")

## THE PARTIES

2.      Mr. Kraft was, at all relevant times, an adult individual, residing in Nassau

County, New York.

3.      Upon information and belief, CompuCom is a foreign business corporation

that is organized and exists under Delaware law, and is authorized to conduct business in

the State of New York, with its principal offices at 7171 Forest Ave, Dallas TX 75230 and

360 N. Cresent  Dr., Beverly Hills CA 90210

4.      Upon information and belief, CompuCom is wholly owned subsidiary of

Office Depot, Inc.

JURISDICTION & VENUE

5.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), as this action is between citizens of different States and the amount in controversy exceeds the sum of $75,000.

6.      Venue is proper under §1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this District, specifically CompuCom employed and underpaid Mr. Kraft in New York, New York.

STATEMENT OF FACTS

7.      CompuCom provides technology solutions, support services and consulting to enable the digital workplace in various industries.

8.      Upon information and belief, CompuCom is a subsidiary of Office Depot Inc.

9.      Mr. Kraft had been successfully employed with Tata Consultancy Services ("TCS") as a Business Development Manager for over 4 years, when CompuCom began pursuing him with offers of employment.  During his years at TCS, Mr. Kraft successfully led the Large Bid Team, responsible for pitching and winning approximately $50MM (and winning the one of the largest IT Services contract ever awarded valued at approx. $108MM per year) in business per year, selling Information Technology ("I/T") solutions, including any combination of software, hardware, I/T consulting services, I/T support services, all the way up to complete outsourcing of the I/T function, to the largest companies; namely, Fortune 50 Companies, like Citigroup, and Morgan Stanley.

10.      Such large scale, or Large Bid sales typically began with the purchaser issuing a Request for Proposal ("RFP") or Request for Quote ("RFQ").  If you did not

receive an RFP or RFQ, your company had no chance of bidding on, let alone winning the business.

11.     CompuCom never had a Large Bid Team, and as a result rarely received RFP's and/or RFQ's for the largest I/T investments, because they lacked the contacts, connections and experience sufficient to deal in that market space.   To jumpstart this highly lucrative business segment, CompuCom recruited Mr. Kraft away from TCS to obtain his reputation, industry knowledge, and industry-wide connections.   He was the guy that CompuCom hired to develop RFP's and RFQ's for Fortune 50 companies, including, Citigroup, JP Morgan, Morgan Stanley, and etc.

12.     CompuCom and Mr. Kraft entered into the CompuCom Account Executive 2018 Sales Incentive Plan, by executing it on or about March 12, 2018 (the "Contract").

13.     Mr. Kraft commenced employment with CompuCom as a Business Development Manager on or about May 22, 2017.

14.     The Contract purports to specify Mr. Kraft's terms of compensation during the time period of January 1, 2018 through December 31, 2018. *See* Contract, p. 3, § Effective Date.

15.     The Contract states that it applies to: "(1) New Service orders with Closed/Won dates in Salesforce, (2) hardware and services invoiced through DIMS gross margin invoicing dates in DIMS, (3) and Salesforce reporting provided for 2018 (hereinafter collectively referred to as "Commissionable Sales") beginning January 1, 2018." *See Id.*

16.     Mr. Kraft was compensated through a mix of base salary and incentives and commissions. Mr. Kraft base salary was $200,000 per year, and the Contract set forth the

additional percentages, incentives and commissions that Mr. Kraft was due to receive for his work.  Mr. Kraft's supervisor, Tim Fisher ("Mr. Fisher"), VP of Sales at CompuCom, informed Mr. Kraft in writing that he expected his salary to be $600,000 to $700,000 per year, all in.

17.     Upon the beginning of his employment with CompuCom, Mr. Kraft immediately began developing relationships and using his industry knowledge and connections in order to get CompuCom access to larger industry-wide opportunities.

18.     Mr. Kraft was successfully able to get CompuCom placement on potential buyer companies' lists to receive RFQ's and RFP's from large industry leaders such as Citibank, Morgan Stanley and JP Morgan Chase. This meant that CompuCom could now bid on projects to which it had no access prior to hiring Mr. Kraft.

19.     As a result of Mr. Kraft's work, in only several months, CompuCom had secured multiple deals with some of the largest financial firms in the world.

20.     Mr. Fisher closely tracked the inception and development of each deal that Mr. Kraft had originated in the Salesforce Software ("Salesforce").

21.     Mr. Kraft often noticed Mr. Fisher checking in on his work and the progress of the deals multiple times a week. As such, Mr. Fisher was fully aware of when each deal Mr. Kraft was working on was about to close and when Mr. Kraft's commissions and incentives were supposed to be paid out by CompuCom.  Often times, Mr. Fisher would manipulate the Salesforce data absent the consent of the sales person, in or to suit his needs. In a slow quarter, he would move certain deals along in the pipeline to give the appearance to his superiors that his sales team was on or exceeding

22.     In or about October 2018, Mr. Kraft had procured over seven large deals, ranging from $150,000 to over $28,000,000 for CompuCom (the "October Deals").

23.     Specifically, Mr. Kraft had originated the October Deals from inception, taking many months to develop, and produced to CompuCom buyers of their products and services who were ready, willing and able to enter into contracts with CompuCom, and did in fact enter into those contracts, or the contracts were otherwise complete, simply awaiting execution.  In short, there was nothing left for Mr. Kraft or CompuCom to do on these deals.

24.     The October Deals for purchase of different bundles of CompuCom's products and services included, but were not limited to, the following:

      a.   $27,200,000 agreement with Citigroup

      b.   $824,550 agreement with Citigroup

      c.   $500,000 agreement with Citigroup

      d.   $80,000 agreement with JP Morgan Chase & Co

      e.   $500,000 agreement with Apollo Global Management LLC

      f.   $340,000 agreement with Morgan Stanley

      g.   $300,000 agreement with Amtrust Financial Services, Inc.

      h.   $150,000 agreement with Finance of America Mortgage LLC

      i.   $1,440,000 agreement with Fairstone Financial LLC

25.     Mr. Kraft's earned commissions and incentives, calculated based on the terms set in the Contract, on the October Deals alone amounted to approximately $627,691 and were supposed to be paid out to Mr. Kraft in or about November 2018.

26.     It was at this opportune moment, just days before Mr. Kraft's commissions were to be paid out, that Mr. Fisher wrongfully terminated Mr. Kraft on October 1, 2018 in order to avoid paying out over $627,691 in commissions to him.

27.     CompuCom did not pay Mr. Kraft any commissions during his employment.

28.     Had CompuCom kept Mr. Kraft employed for just 30 days longer, until November 1, 2018, it would not be able to attempt to deceitfully pocket the money earned by Mr. Kraft.

29.     Mr. Kraft had earned his commissions on the October Deals, as he was the procuring cause of sales and had provided CompuCom with the sales opportunities and deals, and but for CompuCom's wrongful termination of Mr. Kraft just a couple of days before the signing of the final paperwork, Mr. Kraft's commission payout would have followed in the next pay cycle.

30.     In fact, upon information and belief, CompuCom began advertising for Mr. Kraft's position less than six months after it unlawfully terminated Mr. Kraft, further demonstrating that CompuCom terminated Mr. Kraft solely to avoid paying him his earned commissions.

31.     CompuCom's wrongful termination of Mr. Kraft, caused at least two of the October Deals to fall through as Mr. Kraft's clients did not want to work with CompuCom without the security of Mr. Kraft.

32.     If CompuCom did not wrongfully terminate Mr. Kraft, CompuCom would not have lost these deals or clients, and as such CompuCom owes Mr. Kraft his commissions on any of the October Deals that have not been successful due to

CompuCom's wrongdoing.  Furthermore, CompuCom's Contract fails to define several key terms of Mr. Kraft's compensation, leaving the door open to unfair financial windfalls for CompuCom if it chooses to wrongfully and untimely terminate its employees, as it happened with a high-earner, Mr. Kraft.

33.     Specifically, the Contract is silent on when an employee's commissions are earned, and only specifies when some of the commission and incentives become "*fully* earned."

34.     The Contract states that "[c]ommission amounts become *fully* earned upon any final reconciliation." *See* Contract, p. 4, § Product Gross Margin (emphasis added); § New Service Orders (same).

35.     However, the Contract does not define the term "fully earned," "reconciliation" or "final reconciliation," leaving them vague and ambiguous for CompuCom to improvise.

36.     The Contract further fails to specify another material term, the frequency of "reconciliation" or "final reconciliation," further leaving CompuCom's employees' at the full discretion of CompuCom to determine when, if ever, they have earned to be paid.

37.     Without a timeframe or time limit on when CompuCom has to conduct reconciliation, the Contract fails to state in any reasonably ascertainable manner when the commissions are to be considered earned and have to be paid out to CompuCom's employees.

38.     The Contract does not state that the right to commissions ceases upon Mr. Kraft's termination.

39.     Furthermore, the Contract expressly states that "product orders that are invoiced/reported on or before [employee's] last day of employment will be considered eligible for payment under this [Contract]." *See* Contract, p. 8, § Termination of Employment.

40.     Upon information and belief, all of the October Deals were essentially invoiced or reported long before Mr. Kraft's unlawful termination. Furthermore, Mr. Fisher had full knowledge of the progression and the late stages of these deals, as he frequently checked the status of Mr. Kraft's work in Salesforce before wrongfully terminating him.

41.     The Contract does not require performance of services in their entirety, and as such, Mr. Kraft was not obligated to provide any further services after he had procured and produced buyers capable and willing to enter into contracts with CompuCom, which did, in fact, enter into sales agreements with CompuCom and resulted in sales for it.

42.     Despite the fact that CompuCom may have delivered goods and services to the buyers post Mr. Kraft's termination, Mr. Kraft procured and secured the sales of such services before the end of October 2018 and had in fact earned his commissions.

43.     Upon information and belief, the October Deals' sales and terms were reviewed against the terms of the sale.

44.     Because of CompuCom's wrongful termination of Mr. Kraft, it had lost at least two of the October Deals that Mr. Kraft had procured, one deal with Citigroup for the value of $27,200,000, and second deal with Morgan Stanley, for the value of $340,000.

45.     Upon information and belief, both of these buyers, Citigroup and Morgan Stanley, decided not to award business or further work with CompuCom once Mr. Kraft

no longer worked there, as their prior relationship with Mr. Kraft was the only reason, they had even considered placing such large orders.

46.     Upon information and belief, but for, CompuCom's wrongful termination of Mr. Kraft, the two deals with Citigroup and Morgan Stanley were ready to close, and as such, CompuCom is also liable to Mr. Kraft for lost commission on these deals for the time, efforts and services he provided in procuring these deals for CompuCom.

47.     CompuCom owes Mr. Kraft his earned wages, including but not limited to, the commissions he lost on all the October Deals.

<u>FIRST CAUSE OF ACTION</u>
BREACH OF CONTRACT CLAIM AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

48.     Mr. Kraft repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

49.     Mr. Kraft entered into a valid and binding agreement with CompuCom to provide services for the purpose of procuring prospective clients.

50.     Mr. Kraft performed his duties and responsibilities under the Contract by procuring at least nine clients for CompuCom through the October Deals.

51.     Mr. Kraft fully performed all of its obligations to CompuCom under the Contract, and all of the conditions required to be performed before the deals could be finalized were completed.  There was nothing left to be done on the October Deals.

52.     CompuCom frustrated, prevented and hindered the October Deals that were withdrawn (the "Withdrawn Deals") from being finalized by wrongfully terminating Mr. Kraft, knowing that he was the only reason those companies even considered entering into contracts with CompuCom.

53.     CompuCom was obligated to pay Mr. Kraft his commissions earned on the Withdrawn Deals because CompuCom caused the deals to be cancelled.

54.     CompuCom was obligated to pay Mr. Kraft commissions for the services he provided in connection with procuring the October Deals, including on the Withdrawn Deals.

55.     CompuCom breached the Contract and the implied covenant of good faith and fair dealing by failing to pay Mr. Kraft his earned commissions and incentives based on the percentages set forth in the Contract.

56.     CompuCom's breaches have financially damaged Mr. Kraft.

57.     CompuCom is liable to Mr. Kraft for his damages, prejudgment interest and all other relief the Court affords.

<u>SECOND CAUSE OF ACTION</u>
UNPAID COMMISSIONS UNDER THE NEW YORK LABOR LAW

58.     Mr. Kraft repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

59.     CompuCom is an employer within the meaning of N.Y. Lab. Law §§ 190, 196-d, 615(5), 652 and supporting New York State Department of Labor Regulations and employed Mr. Kraft.

60.     Mr. Kraft's principal duties for CompuCom were the selling of services and his earnings were paid in part on commissions and incentives. Mr. Kraft is a "commissioned salesperson" within the meaning of the Labor Law. N.Y. Lab. Law § 190.

61.     After terminating his employment, CompuCom was required to pay Mr. Kraft his "wages not later than the regular pay day for the pay period during which the termination occurred . . ." N.Y. Lab. Law § 191(3).

62.     Commissions constitute "wages." N.Y. Lab. Law § 190(1).

63.     CompuCom violated the Labor Law by not paying Mr. Kraft his commissions by the first regular payday that followed the termination of his employment. N.Y. Lab. Law § 191(3).

64.     CompuCom is liable to Mr. Kraft for all unpaid commissions, attorneys' fees and expenses, prejudgment interest and liquidated damages. N.Y. Lab. Law § 198.1-a.

THIRD CAUSE OF ACTION
UNJUST ENRICHMENT

65.     Mr. Kraft repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

66.     CompuCom received the benefits of Mr. Kraft's work throughout his employment, including his daily services to CompuCom, his industry expertise and connections, as well as his business development skills, which all resulted in new business and sales for CompuCom and for which it received or will receive hundreds of thousands in sales and revenue, yet CompuCom failed to pay Mr. Kraft his earned commissions, and failed to deliver to him the promised incentives and other forms of pay agreed as part of his employment.

67.     But for Mr. Kraft's expertise and services, CompuCom would not have access to the clients who were willing and able to enter, and did in fact enter, into the large scale sales agreements like the ones Mr. Kraft procured and developed during his employment, including, but not limited to, the October Deals.

68.     CompuCom would not be able to obtain any of the October Deals without Mr. Kraft, and as such, CompuCom would not have received the financial benefit it has

received or that it will receive from the October Deals but for Mr. Kraft's services and expertise.

69.     Mr. Kraft had a reasonable expectation of his earned commissions and incentive compensation for his work given the parties' relationship and interactions as described above.  CompuCom failed to provide said earned commissions and incentives to Mr. Kraft.

70.     As a result of CompuCom's misconduct, Mr. Kraft has suffered, and continues to suffer damages including, but not limited to, lost commissions and incentives, compensatory and consequential damages.

FOURTH CAUSE OF ACTION<br>QUANTUM MERUIT

71.     Mr. Kraft repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

72.     Mr. Kraft provided services to CompuCom in good faith.

73.     Mr. Kraft performed these services with the reasonable expectation that CompuCom would pay him for the value of those services.

74.     CompuCom was aware of Mr. Kraft's expectation of payment.

75.     CompuCom accepted the benefit of the services rendered by Mr. Kraft.

76.     Mr. Kraft was the procuring cause of the October Deals.  There was a direct proximate link between Mr. Kraft's introduction of companies, like CitiGroup and Morgan Stanley, to CompuCom and the October Deals.

77.     Notwithstanding the above, CompuCom has failed to pay Mr. Kraft the commissions he earned for performing those services.

78.     As a result of CompuCom's misconduct, Mr. Kraft has suffered, and continues to suffer damages including, but not limited to, lost commissions and incentives, compensatory and consequential damages.

PRAYER FOR RELIEF

WHEREFORE, Mr. Kraft respectfully requests that this Court grant the following relief:

1.      Accepts jurisdiction over this matter.

2.      Impanels and charges a jury with respect to the causes of action.

3.      An award of unpaid commissions under the Labor Law that exceeds $627,691;

4.      An award of breach of contract and implied covenant of good faith and fair dealing damages that exceeds $627,691;

5.      An award for unjust enrichment that exceeds $627,691;

6.      An award of liquidated damages, prejudgment and post-judgment interest;

7.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

8.      Such other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Fed. R. Civ. P. 38(b), Mr. Kraft demands a trial by jury on all questions

of fact the Complaint raises.

Dated:  New York, New York
        May 17, 2019

                              LIPSKY LOWE LLP

                              <u>s/ Christopher H. Lowe</u>
                              Christopher H. Lowe
                              Milana Dostanitch
                              630 Third Avenue, Fifth Floor
                              New York, New York 10017-6705
                              Tel: 212.392.4772
                              Fax: 212.444.1030
                              chris@lipskylowe.com
                              milana@lipskylowe.com
                              *Attorneys for Plaintiff Richard Kraft*