UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD KRAFT,                                    Index No. 19-cv-4574

                    Plaintiff,

        -against-

COMPUCOM SYSTEMS, INC.,

                    Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
RICHARD KRAFT'S FIRST AMENDED COMPLAINT**

---

Eli Z. Freedberg
Maria Caceres-Boneau
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Defendant*

TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ......................................................................................... 1

II.     PROCEDURAL & FACTUAL BACKGROUND ........................................ 1

        A.      Kraft's Allegations................................................................... 1

        B.      Terms Of The Agreement ....................................................... 5

III.    LEGAL STANDARD................................................................................... 6

IV.     KRAFTS' AMENDED COMPLAINT FAILS TO STATE A CAUSE OF
        ACTION ...................................................................................................... 8

        A.      The Court Should Dismiss Kraft's New York Labor Law Claim Because
                The New York Labor Law Does Not Apply And Florida's Law Does
                Apply....................................................................................... 8

        B.      Kraft Has Not Pled A Contractual Right To Commission Compensation........... 10

                1.      Kraft Does Not Plead That The October Deals Were Closed When
                        His Employment Was Terminated, And, Therefore, He Is Not
                        Eligible For Commissions........................................................ 12

                2.      Kraft Is Not Entitled To Commissions On New Logo Service
                        Orders................................................................................... 17

        C.      Kraft's Breach Of The Implied Covenant Of Good Faith And Fair Dealing
                Fails......................................................................................... 18

        D.      Kraft's Quasi-Contract Claims Premised On The Same Facts As The
                Breach Of Contract Claim Fail ............................................. 19

V.      CONCLUSION............................................................................................. 21

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Accardi v. EMS Aviation, Inc.*,
    No. 2:10-cv-469-ftm-36dnf, 2011 WL 13294635 (M.D. Fl. Nov. 16, 2011) .........................18

*Architectonics, Inc. v. Control Sys. Inc.*,
    935 F. Supp. 425 (S.D.N.Y. 1996)........................................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................................7

*ATA-CIF, LLC v. IECUBED, LLC*,
    No. 8:11-cv-603-T-33EAJ, 2011 WL 6217508 (M.D. Fla. Dec. 14, 2011) ..........................20

*Barth Packaging Inc. v. Excelsior Packaging Grp.*,
    No. 11-cv-2563, 2011 WL 3628858 (S.D.N.Y. Aug. 16, 2011)...............................................19

*Beng Soon Lim v. Harvest Int'l Realty, Inc.*,
    Index No. 08-cv-3505, 2009 U.S. Dist. LEXIS 109389 (E.D.N.Y. Nov. 23.
    2009) ...................................................................................................................................15

*Brown v. New York City Hous. Auth.*,
    No. 05 Civ. 7332, 2006 U.S. Dist. LEXIS 30193 (S.D.N.Y. May 16, 2006)..........................7

*Dhir v. Carlyle Group Employee Co.*,
    No. 16-cv-06378 (RJS), 2017 WL 4402566 (2017) .............................................................19

*Eason v. Contract Connection Inc.*,
    2009 WL 260985 (M.D. Fl. Feb. 4, 2009)..............................................................................9

*Enola Contracting Servs., Inc. v. URS Group, Inc.*,
    No. 5:08-cv-2-RS-EMT, 2008 WL 1844612 (N.D. Fl. Apr. 23, 2008)..................................18

*Frishberg v. Esprit de Corp.*,
    778 F. Supp. 793 (S.D.N.Y. 1991), *aff'd*, 969 F.2d 1042 (2d Cir. 1992) ...............................9

*Frontline Processing Corp. v. Merrick Bank Corp.*,
    No. 13-cv-3956, 2014 WL 837050 (S.D.N.Y. Mar. 3, 2014)..................................................11

*Giugliano v. FS2 Capital Partners LLC*,
    Index No. 14-cv-7240, 2015 WL 5124796 (E.D.N.Y. Sept. 1, 2015)........................10, 17, 18

TABLE OF AUTHORITIES
(CONTINUED)

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009)................................................................................7

*Harris v. Provident Life & Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002)..............................................................................18

*Harrison v. Toptani Law Office*,
    No. 11 Civ. 6801 (LTS), 2012 WL 694755 (S.D.N.Y. Mar. 2, 2012)...................20

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir.1996)..............................................................................11

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
    230 F.3d 549 (2d Cir.2000)..............................................................................9

*Int'l Audiotext Network. Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995) ................................................................................7

*Int'l Star Registry of Illinois v. Omnipoint Mktg.*,
    LLC, 510 F. Supp. 2d 1015 (S.D.Fla. 2007)........................................................11

*Karmilowicz v. Hartford Fin. Servs. Group, Inc.*,
    494 Fed. App'x 153 (2d Cir. 2012)..............................................................*passim*

*Keystone Auto. Indus., Inc. v. Montalvo*,
    No. 14-cv-1637, 2014 WL 3696266 (E.D.N.Y. July 24, 2014)...............................7

*Lalic v. CG RYC, LLC*,
    No. 18-cv-20118, 2018 WL 5098983 (S.D. Fl. Aug. 13, 2018) ............................10

*Lee v. Regal Cruises, Ltd.*,
    916 F. Supp. 300 (S.D.N.Y. 1996), aff'd, 116 F.3d 465 (2d Cir. 1997)..................10

*Matusovsky v. Merrill Lynch*,
    186 F.Supp.2d 397 (S.D.N.Y. 2002)....................................................................8

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
    418 F.3d 168 (2d Cir. 2005)............................................................................19

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
    392 F.3d 520 (2d Cir. 2004)............................................................................18

*Ocean Commc'ns, Inc. v. Bubeck*,
    956 So. 2d 1222 (Fla. Dist. Ct. App. 2007) ......................................................20

## TABLE OF AUTHORITIES
(CONTINUED)

*Pachter v. Bernard Hodes Group, Inc.*,
    10 N.Y.3d 609, 891 N.E.2d 279, 861 N.Y.S.2d 246 (2008).....................................................15

*PNC Bank, National Assoc. v. The Fresh Diet Inc.*,
    Case No. 17-cv-21027-KMM, 2018 WL 3412871 (S.D. Fla. Mar. 22, 2018) .......................20

*Pouncy v. Advanced Focus, LLC*,
    No. 15-CV-6260 (JMF), 2017 WL 4280949 (S.D.N.Y. Sept. 15, 2017)................................10

*R.B. Ventures, Ltd. v. Shane*,
    112 F.3d 54 (2d Cir. 1997)..................................................................................................19

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)....................................................................................................8

*Sanders v. Grenadier Realty, Inc.*,
    367 F. App'x. 173 (2d Cir. 2010) ........................................................................................13

*Schwartz v. Dennison*,
    518 F. Supp. 2d 560 (S.D.N.Y. 2007)...................................................................................7

*Srour v. Dwelling Quest Corp.*,
    5 N.Y.3d 874, 808 N.Y.S.2d 128 (2005) ..............................................................................15

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ...........................................................................................10

*Walker v. Schult*,
    717 F.3d 119 (2d Cir. 2013).................................................................................................7

*Wall v. CSX Transp., Inc.*,
    471 F.3d 410 (2d Cir. 2006).................................................................................................8

*Williams v. Citibank. N.A.*,
    565 F. Supp. 2d 523 (S.D.N.Y. 2008)...................................................................................8

*Williams v. Wells Fargo Bank*,
    No. 11-21233, 2011 WL 4901346 (S.D. Fl. Oct. 14, 2011) ................................................20

*Winter-Wolff Int'l, Inc. v. Alcan Packaging Food and Tobacco, Inc.*,
    499 F. Supp. 2d 233 (E.D.N.Y. 2007) ..................................................................................9

## Statutes

New York Labor Law ............................................................................................ *passim*

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

**Other Authorities**

Federal Rules of Civil Procedure Rule 12(b)(6) .................................................................. *passim*

## I.      INTRODUCTION

The Court should dismiss Plaintiff Richard Kraft's ("Kraft") First Amended Complaint against Defendant CompuCom Systems, Inc. ("CompuCom"), which asserts that: (i) CompuCom breached its contract and an implied covenant of good faith and fair dealing with Kraft by failing to pay Kraft commissions, (ii) CompuCom violated the New York Labor Law ("NYLL") by failing to pay Kraft commissions, and (iii) CompuCom is guilty of unjust enrichment and *quantum meruit*. Although this is Kraft's second attempt at filing a Complaint that states a valid cause of action, Kraft's claims do not pass muster because he fails to allege that he earned commissions pursuant CompuCom's Account Executive 2018 Sales Incentive Plan ("Agreement"). Kraft's primary failure is that he fails to assert that most of the deals he worked on ultimately closed, which is a condition precedent to earning commissions under the Agreement.  Plaintiff also fails to allege that he met the sales quota on one type of order, which automatically defeats his claim to commissions on five deals of this type.  Moreover, Kraft's statutory claim pursuant to the NYLL should be dismissed based on the choice-of-law provision contained in the Agreement.  Kraft brought all of his claims under New York law, but the Agreement specifically provides that Florida law governs the terms of the Agreement.  As a result, he is not entitled to any commissions and his claims must be dismissed. Accordingly, the Court should dismiss Kraft's claims with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.     PROCEDURAL & FACTUAL BACKGROUND

### A.     Kraft's Allegations[1]

CompuCom provides technology solutions, support services, and consulting to enable the

---

[1] For the purposes of this motion only, CompuCom accepts Kraft's non-conclusory factual allegations as true. CompuCom, however, reserves the right to seek discovery and to deny any and all non-conclusory factual allegations, should the Court deny this motion to dismiss.

digital workplace for businesses.  *See* Declaration of Eli Z. Freedberg in Support of Defendant's Motion to Dismiss Richard Kraft's First Amended Complaint ("Feedberg Decl."), Ex. A ("Amended Complaint") at ¶ 7.)  Kraft commenced his employment with CompuCom as a Business Development Manager on or about May 22, 2017.  (*Id.* at ¶ 12.)  CompuCom and Kraft entered into the Agreement on or about March 12, 2018, which set forth the terms of compensating Kraft during the time period of January 1, 2018 through December 31, 2018.  (*Id.* at ¶¶ 13-14; Affidavit of David Starnes, dated September 17, 2019 ("Starnes Aff."), Ex. A (the Agreement).)

Kraft received a base salary of $200,000 per year, and the Agreement set forth the commissions he was due to receive.  (*Id.* ¶ 15.)  He claims that he is owed approximately $627,691 in commissions and incentives on deals he originated in or around October 2018 ("October Deals") and that "were supposed to be paid out to [him] in or around November 2018."  (*Id*. ¶¶ 34, 37.)  As to these deals, he specifically claims that he "produced to CompuCom buyers of their products and services who were ready, willing and able to enter into contracts with CompuCom, and did in fact enter into those contracts, or the contracts were otherwise complete, simply awaiting execution."  (*Id*. ¶ 35.)  Kraft does not identify any customers that actually signed, executed, consummated and entered into agreements with CompuCom or the date on which any customers who were allegedly part of the October Deals signed an agreement with CompuCom.

Kraft identifies nine service orders to which he claims he is entitled commissions and separates them into two categories:  Installed Service Orders and New Logo Service Orders.  (*Id.* at ¶ 36.)  He names four Installed Service Orders totaling over $4,000,000 and five New Logo Service Orders totaling $2,730,000.  (*Id.*)

In describing the status of these nine service orders at the time of his termination, Kraft divides them into three types of deals:  Closed Deals, Withdrawn Deals, and the Apollo Deal.  (*Id.*

at ¶¶ 42, 50, 57.)  Kraft labels five service orders as "Closed Deals."  (*Id.* at ¶ 43.)

With respect to the so-called "Closed Deals" Kraft employs verbal gymnastics to present the appearance that these alleged deals were consummated.  If Kraft had in fact gotten Citigroup, JP Morgan Chase & Co. ("JP Morgan"), Amtrust Financial Services, Inc. ("Amtrust"), Finance of America Mortgage LLC ("Finance of America"), and Fairstone Financial LLC ("Fairstone") to enter into signed contracts with CompuCom, it would be very easy to say so directly.  It is telling that he does not make such a direct statement.  Instead, Kraft obfuscates and pleads that "[t]he Contract does not require performance of services in their entirety, and as such, Mr. Kraft was not obligated to provide any further services after he had procured and produced buyers capable and willing to enter into contracts with CompuCom, which did, in fact, enter into sales agreements with CompuCom and resulted in sales for it." [2]  (*Id.* at ¶ 47.) This indirect and confounding sentence does not directly plead that either Citigroup, JP Morgan, Amtrust, Finance of America, or Fairstone actually signed a contract with CompuCom prior to Kraft's termination from the company.  While this allegation seems to state that he could have procured buyers, he does not tie this back to the clients relating to the alleged "Closed Deals."

The Court should not be tricked by Kraft's turn of phrase.  Specifically, despite characterizing these opportunities as "Closed Deals," Kraft never goes so far as alleging that these sales were consummated.  Kraft pleads that he "earned his commissions on the Closed Deals, as he was the procuring cause of the sales, had provided CompuCom with the sales opportunities and deals, and they were at the Closed/Won stage at the time of his termination."  (*Id.* at ¶ 43.) The Court should take notice that Kraft merely pleads that these deals were at the "Closed/Won *stage*"

---

[2] This statement is flatly contradicted by the Agreement, which provides that "[w]ith each service order, the Participant typically has an ongoing duty to maintain and develop the relationship with the client for at least, but not limited to, the twelve months immediately following the Closed/Won Date of the order."  (Starnes Aff., Ex. A at 4.)

(emphasis added) and that he was the "procuring cause of the sales." He simply does not plead that these deals actually closed and in fact acknowledges that these deals did not, in fact, close. Indeed, within the same sentence he affirmatively states that the alleged "Closed Deals" never closed and that further acknowledges that "but for" the termination of his employment "a couple of days before the signing of the final paperwork, [his] commission payout would have followed in the next pay cycle." (*Id.*) Kraft also shows his uncertainty as to whether any of the "Closed Deals" eventually closed following his termination by alleging only that "CompuCom *may* have delivered goods and services to the buyers." (*Id.* at ¶ 46 (emphasis added)). Notably, Kraft fails to provide a "Salesforce Closed/Won date" for any of the deals he identifies as "Closed" deals.

Kraft identifies two deals as having been withdrawn by clients. Kraft alleges that these "Withdrawn Deals" "were ready to close . . . . [and] would have gone through" if his employment had not been terminated. (*Id.* at ¶¶ 50-52.)

The final deal Kraft identifies is the "Apollo Deal," which he admits did not close. (*See id.* at 57.)

For each of the "Closed Deals," "Withdrawn Deals," and "Apollo Deal," Kraft alleges that he is entitled to commissions on these deals because he "was the procuring cause" and "produced buyers capable and willing to enter into contracts with CompuCom" (*Id.* at ¶¶ 47, 54, 58) even though this is not how the Agreement provided that Kraft would earn commissions. Contrary to Kraft's contentions that the Agreement does not provide a manner to determine when "commissions are to be considered earned and have to be paid out to CompuCom's employees" and that the Agreement "does not state that the right to commissions ceases upon [his] termination" (*Id.* ¶¶ 24, 27), the Agreement does address these specific terms as described in detail below.

Notably, Kraft fails to cite anywhere in his Amended Complaint the provisions contained in the "Termination of Employment" section of the Agreement.

### B.    Terms Of The Agreement

The Agreement "is designed to provide clear and easy-to-understand monetary incentives for Account Executives and to provide enhanced incentive compensation to reward those who *exceed their quota*." (Starnes Aff., Ex. A at 3 (emphasis added).) Of relevance here, the Agreement applies to "New Service orders with *Closed/Won dates* in Salesforce." (Freedberg Decl., Ex. A at ¶ 15; Starnes Aff., Ex. A at 3 (emphasis in original), App'x 3 ("Sales Orders are created when a service opportunity is Closed/Won in Salesforce.")

Kraft was given two personalized quotas, which were provided in Appendix 2 of the Agreement. (Starnes Aff., Ex. A at 3, App'x 2.) Quotas for "Installed Services Orders" and "New Logo Service Orders" of $4,000,000 each are provided in Appendix 2. (*Id.*) The Agreement provides that the "[s]ervice quota credit is counted the month of the order Closed/Won date (in the amount of the Service Year 1 Amount)." (*Id.*)

The Agreement also provides that "New Service Orders incentives will be earned and paid in up to 3 installments over time." (*Id.* at 4.) The initial payment is calculated as 50% of the Service Year 1 Amount times a commission payout rate provided in the Agreement, and "[e]ach month, orders with a Closed/Won Date within the month are evaluated, and a preliminary payment is made as an advance against commissions." (*Id.* (emphasis added).) Further, the "initial payment amount becomes fully earned upon any final reconciliation of the order and the Participant's commission account, subject to the terms and conditions set forth in the [Agreement]. Commissions are paid one month in arrears." (*Id.*) "The second payment is calculated as 25% of the Service Year 1 Amount times the commission payout rate for the metric," and an evaluation of whether the second payment has been fully earned occurs 6 months after the Closed/Won Date

and upon final reconciliation of the order and the Participant's commission account.  (*Id.*)  Whether a third and final payment will be made is evaluated 12 months after the Closed/Won Date.  (*Id.*)  This "final payment is based on invoiced value times the commission payout rate for the metric minus prior payments" and becomes "fully earned" upon final reconciliation of the order and the Participant's commission account.  (*Id.* at 4-5.)

The Agreement specifies that "[i]ncentives are not earned until a sale is reviewed against the terms of the sale."  (*Id.* at 6.)  Moreover, "[n]o incentive will be earned if an unauthorized person executes any binding contract or required approvals are not completed prior to contract signing.  Contract signing authority is limited to specific individuals according to Business Rules." (*Id.* at 8.)  Kraft signed the Agreement, acknowledging that he understood that "[a]ll contracts must be reviewed by the appropriate CompuCom personnel and executed by only those authorized by CompuCom," and that he was not authorized to sign contracts.  (*Id.* at 11.)

Of critical importance are the provisions within the "Termination of Employment" section of the Agreement.  If a Participant is terminated, like Kraft, the initial payment on a service order is "considered earned and eligible for payment" only if the "Salesforce Closed/Won date [is] on or before the Participant's last day."  (*Id.* at 8.)  The second and final installment payments are considered "earned and eligible for payment only for the months the Participant is active on the Plan and only if the Participant is employed through the last day of the month in which the related payment reconciliation for the incentive is conducted."  (*Id.*)

The Agreement contains a choice of law provision providing that it "shall be governed in accordance with the laws of the state of Florida." (*Id.* at 9.)

## III.   LEGAL STANDARD

In deciding a Rule 12(b)(6) motion to dismiss, a court must accept the plaintiff's factual allegations as true and construe those allegations in the manner most favorable to the plaintiff.

*Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013).  However, a court is not required to accept as true legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments.  *Harris v. Mills,* 572 F.3d 66, 71-72 (2d Cir. 2009) (*citing Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).  In addition, the plaintiff must plead sufficient factual matter to render the legal claim plausible, not just merely possible.  *Keystone Auto. Indus., Inc. v. Montalvo,* No. 14-cv-1637, 2014 WL 3696266, at *2 (E.D.N.Y. July 24, 2014) (citing *Iqbal,* 556 U.S. at 679).  The Supreme Court has stressed that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal,* 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  Rather, to survive a motion to dismiss, a complaint must (i) contain sufficient facts (not merely legal conclusions or recitation of necessary elements) and (ii) state a plausible-and not simply a conceivable-claim.  *Id.* at 678-79.

Courts are generally limited to "'the factual allegations in [the] complaint, documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiff's possession or of which plaintiff had knowledge and relied [on] in bringing suit.'" *Schwartz v. Dennison*, 518 F. Supp. 2d 560, 566-67 (S.D.N.Y. 2007) (quoting *Brass v. American Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Notably, as is the case here, where the allegations set out in the complaint are contradicted by an agreement incorporated into the complaint by reference, the court is not obliged to credit the allegations in the complaint as true.  *Brown v. New York City Hous. Auth.*, No. 05 Civ. 7332, 2006 U.S. Dist. LEXIS 30193, at *4-5 (S.D.N.Y. May 16, 2006).  Moreover, it has been widely held in the Second Circuit that, where a plaintiff's allegations are contradicted by a document that the plaintiff has incorporated by reference in the complaint, the document controls.  *See Int'l Audiotext Network. Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("The court need not accept as

true an allegation that is contradicted by documents on which the complaint relies"); *see also Williams v. Citibank. N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Matusovsky v. Merrill Lynch*, 186 F.Supp.2d 397, 400 (S.D.N.Y. 2002).   Here, the Court can consider the terms of the Agreement, which are incorporated in the Complaint by reference.  *See Karmilowicz v. Hartford Fin. Servs. Group, Inc.*, 494 Fed. App'x 153, 156 (2d Cir. 2012) (affirming dismissal of complaint where the "documents clearly indicate [that Defendants] did not breach any contract"); *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir. 2000).

When measured against this standard, Kraft's Amended Complaint fails to state a cause of action.  The allegations made in the Amended Complaint are contradicted by the terms of the Agreement. Accordingly, Kraft's Amended Complaint should be dismissed.

## IV.     KRAFTS' AMENDED COMPLAINT FAILS TO STATE A CAUSE OF ACTION

### A.     The Court Should Dismiss Kraft's New York Labor Law Claim Because The New York Labor Law Does Not Apply And Florida's Law Does Apply

Kraft's second cause of action asserts a violation of the NYLL.  The Court should dismiss this claim for the simple reason that the NYLL does not apply because the parties' Agreement expressly provides that "this Plan shall be governed in accordance with the laws of the state of Florida." Since the underpinnings of the NYLL claim assert an entitlement to commissions pursuant to the Agreement, the Agreement's choice of law provision applies and prevents the NYLL from being applicable here. Accordingly, Kraft's claim for violation of the NYLL should be dismissed.

Federal courts sitting in diversity, as the Court is here, apply the choice-of-law rules of the forum location.  *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006).  Under New York choice-of-law rules, where parties enter into a contract and expressly agree on the governing law,

"New York courts give 'great deference' to that choice and will apply the chosen substantive law unless 'the jurisdiction whose law is to be applied has no reasonable relation to the agreement or where enforcement of the provision would violate a fundamental public policy.'" *Architectonics, Inc. v. Control Sys. Inc.*, 935 F. Supp. 425, 431 (S.D.N.Y. 1996) (quoting *Am. Special Risk Ins. Co. v. Delta Am. Re Ins. Co.*, 836 F. Supp. 183, 188 (S.D.N.Y. 1993); *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir.2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."). Here, the Agreement provides that it is "governed in accordance with the laws of the state of Florida." (Starnes Aff., Ex. A at 9.)

The Agreement's choice of law provision is broad enough to encompass all of Kraft's claims that arise from the terms of the Agreement, including his statutory claim under the NYLL for failure to pay commissions allegedly owed under the Agreement. *Winter-Wolff Int'l, Inc. v. Alcan Packaging Food and Tobacco, Inc.*, 499 F. Supp. 2d 233, 243 (E.D.N.Y. 2007) (dismissing plaintiff's NYLL claim because the choice of law provision in the contract stated that Illinois law governed); *See e.g., Frishberg v. Esprit de Corp.*, 778 F. Supp. 793, 803 (S.D.N.Y. 1991) (holding that claims under NYLL were "entirely dependent on contract claims"), *aff'd*, 969 F.2d 1042 (2d Cir. 1992); *see also Eason v. Contract Connection Inc.*, 2009 WL 260985, *2-3 (M.D. Fl. Feb. 4, 2009) (dismissing claim for violations of the North Carolina Wage and Hour Act where the contract provided that Florida law governed enforcement of the contract). Thus, Kraft's NYLL claims are inapplicable because Florida law applies, and, as such, the Court should dismiss this cause of action.[3]

---

[3] Even if New York law applies, Kraft's sections 190, 191, and 198 claims under the NYLL should be dismissed because a plaintiff "cannot assert a claim for wages under the Labor Law if he has no enforceable contractual right to

The Court should also not allow Kraft to amend his Amended Complaint to assert a claim pursuant to Florida law because such an amendment would be futile. *See Lee v. Regal Cruises, Ltd.*, 916 F. Supp. 300, 303 (S.D.N.Y. 1996), aff'd, 116 F.3d 465 (2d Cir. 1997) ("the Court may deny leave if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) the opposing party would be prejudiced, or (4) would be futile"). Claims for unpaid commissions in Florida are brought as breach of contract claims, not as statutory claims. The court in *Lalic v. CG RYC, LLC*, No. 18-cv-20118, 2018 WL 5098983, *7 (S.D. Fl. Aug. 13, 2018), recently explained that there is no statutory wage claim for unpaid commissions under Florida law. *See also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1291 (11th Cir. 2009). The *Lalic* court specifically held that, "actions for unpaid wages are typically pled as breach of contract claims wherein the agreement in question happens to be an employment or compensation contract.'" *Lalic*, 2018 WL 5098983, *7 (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1271 (11th Cir. 2009). As discussed in more detail below, Kraft has not sufficiently pled a breach of contract claim under Florida law, and, accordingly, his Amended Complaint should be dismissed, and Kraft should not be permitted to amend his Amended Complaint to assert a claim under Florida law.

**B.    Kraft Has Not Pled A Contractual Right To Commission Compensation**

The Court should dismiss Kraft's breach of contract claims. In order to state a claim for

---

those wages." *Karmilowicz*, 494 Fed. App'x at 158 (quoting *Tierney v. Capricorn Investors, L.P.*, 189 A.D.2d 629, 632, 592 N.Y.S.2d 700 (1st Dep't 1993); *see also Giugliano*, 2015 WL 5124796, *17 (dismissing the plaintiff's NYLL claim because the plaintiff did not have an enforceable contract right to commissions); *Pouncy v. Advanced Focus, LLC*, No. 15-CV-6260 (JMF), 2017 WL 4280949, at *8 (S.D.N.Y. Sept. 15, 2017) (rejecting NYLL claim brought by a commissioned-salesperson where defendant complied with the written employment agreement). As discussed in more detail below, Kraft does not adequately plead a breach of contract claim and does not properly plead that he was owed commissions pursuant to the terms of the Agreement. Accordingly, even if the NYLL applies, Kraft's NYLL claims should be dismissed for the same reasons that the breach of contract claims should be dismissed.

breach of contract under Florida law,[4] a plaintiff must plead that there was (1) a valid contract, (2) a material breach, and (3) damages. *Int'l Star Registry of Illinois v. Omnipoint Mktg.*, LLC, 510 F. Supp. 2d 1015, 1022 (S.D.Fla. 2007) (citing *Abbott Lab., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. 5th DCA 2000)). Here, Kraft has failed to plead that CompuCom breached the Agreement because he has not satisfactorily pled that any of the nine deals on which his claim is based ever closed. In other words, the Agreement is clear that CompuCom owes terminated Account Executives their initial payment of commission compensation only if the "Salesforce Closed/Won date [is] on or before the Participant's last day" of employment. (Starnes Aff., Ex. A at 10.) Kraft's failure to explicitly allege that the October deals were closed (as opposed to simply procured or introduced), requires a holding that Kraft has failed to plead a viable breach of contract claim. Kraft also fails to adequately plead a breach of contract claim with respect to five of the nine deals forming the basis of his claim, because he does not allege that he reached the $4,000,000 quota for New Logo Service Orders. Pursuant to the explicit terms of the Agreement, CompuCom would only be obligated to pay commissions if a salesperson, such as Kraft, met his quota. Since there is no allegation that Kraft met his quote for these types of deals, then Kraft has not adequately pled that he is entitled to commissions on these deals. Without these allegations, the breach of contract claims should be dismissed.

---

[4] The elements for stating a claim for breach of contract pursuant to New York law, are virtually identical to the elements under Florida law and Kraft fails to plead facts sufficient to state a plausible claim for breach of contract regardless of the law applied. Under New York law, the elements of a claim for breach of contract are: (1) the existence of an agreement, (2) adequate performance of the contract by the Kraft, (3) breach of contract by the defendant, and (4) damages. *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996); *Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13-cv-3956, 2014 WL 837050 (S.D.N.Y. Mar. 3, 2014). "Conclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." *Frontline* (citing *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008)). For the reasons discussed herein, Kraft has not pled that CompuCom breached the Agreement, therefore, even if New York applied to this dispute, those claims should be dismissed.

1.   **Kraft Does Not Plead That The October Deals Were Closed When His Employment Was Terminated, And, Therefore, He Is Not Eligible For Commissions**

As discussed above, the Agreement explicitly provides that commissions can only be earned for "New Service orders with Closed/Won dates in Salesforce." (Starnes Aff., Ex. A at 3.) Moreover, if a Participant in the sales incentive plan is terminated, like Kraft, the initial payment on a service order is "considered earned" <u>only if</u> the "Salesforce Closed/Won date [is] on or before the Participant's last day." (*Id.* at 10.) In other words, the Agreement clearly provides that Kraft could only earn commissions on deals that have been finalized and signed by CompuCom's clients and then entered into CompuCom's Salesforce system with a date noted as the closed/won date. Kraft goes to great lengths in his Amended Complaint to obfuscate the seemingly simple point of whether CompuCom's clients or prospective clients actually signed the deals and whether CompuCom actually entered these closed deals into its Salesforce system, thus morphing the October Deals from prospects into actual closed transactions. Indeed, a close reading of the Amended Complaint shows that Kraft simply does not plead that he "closed" or "won" the October Deals, and definitely acknowledges that these deals eventually did not close. For example, Kraft claims that:

- "In or about October 2018, Mr. Kraft had ***procured*** over seven large deals" (Freedberg Decl., Ex. A at ¶ 34) (emphasis added);

- "Mr. Kraft ***had originated*** the October Deals from inception, taking many months to develop" (*Id.* at ¶ 35) (emphasis added);

- "[Kraft] ***produced to CompuCom*** buyers of their products and services ***who were ready, willing and able to enter into contracts with CompuCom***, and did in fact enter into those contracts, ***or the contracts were otherwise complete, simply***

*awaiting execution*" (*Id.* at ¶ 35) (emphasis added);[5]

- "Mr. Kraft had earned his commissions on the October Deals, *as he was the procuring cause of sales and had provided CompuCom with the sales opportunities* and deals " (*Id.* at ¶ 43) (emphasis added);

- "*Upon information and belief,* all of the Closed Deals were invoiced or reported long before Mr. Kraft's unlawful termination" (*Id.* at ¶ 44) (emphasis added);[6]

- "but for CompuCom's wrongful termination of Mr. Kraft *just a couple of days before the signing of the final paperwork* (*Id.* at ¶ 43) (emphasis added); [7]

- "The Withdrawn Deals, however, *fell through*" (*Id.* at ¶ 50) (emphasis added);[8] and,

- "upon information and belief, *will be entered as Closed/Won into Salesforce in the near future.*" (*Id.* at ¶ 57) (emphasis added).[9]

Taking the above allegations at face value, Kraft merely alleges that he worked to procure potential deals by meeting with prospective clients who may have been interested in CompuCom's

---

[5] This allegation is contradictory in the sense that Kraft pleads that contracts were "entered into" and then he immediately reverses course and pleads that contracts were not signed but were ready to be signed.  In any event, Kraft does not identify any contract that was signed by CompuCom's customers.

[6] The Court should disregard this allegation for the very reason that it was "pled upon information and belief" despite the fact that the assertions pled in this paragraph should be well within Kraft's scope of personal knowledge.  Kraft specifically claims in this paragraph of the Amended Complaint that several deals, which he asserts he was personally responsible for procuring, "were invoiced or reported long before Mr. Kraft's unlawful termination and they were in the Closed/Won stage at the time of Mr. Kraft's termination."  Certainly, if Mr. Kraft was the sole driving force behind these alleged deals, as he alleges, he would know whether the deals had been "invoiced or reported" while he was still with CompuCom.  Courts in this Circuit have repeatedly held that "pleading on information and belief is not an appropriate form of pleading if the matter is within the personal knowledge of the pleader or 'presumptively' within his knowledge, unless he rebuts that presumption." *Sanders v. Grenadier Realty, Inc.*, 367 F. App'x. 173, 175 n.2 (2d Cir. 2010).  Since, this information should be within Kraft's scope of personal knowledge the Court should disregard this allegation.

[7] This allegation appears to clarify the ambiguity of Paragraph 43 of the Amended Complaint.  Clearly, Kraft concedes that the sales were not finalized because he was allegedly terminated before those deals could have been executed.

[8] This allegation indicates that two of the October Deals that Kraft has labeled as "Withdrawn Deals" were never fully consummated.

[9] This paragraph in the Amended Complaint indicates that the "Apollo Deal" referenced in the Amended Complaint was not actually consummated or closed before the termination of Kraft's employment.

products and services.  Furthermore, if Kraft is to be believed, these prospective clients may have been very interested in CompuCom's products and services and these alleged deals may have been on the precipice of execution.  However, Kraft acknowledges that these deals were either never consummated, or "fell through," or were "awaiting execution." Unfortunately for Kraft, the Agreement explicitly does not require CompuCom to pay salespeople commissions for deals that almost closed or for deals that were almost executed.  According to the Agreement, the obligation to pay commissions only vests once a deal is: (a) finalized, and (b) thereafter entered into the Salesforce system.  Since none of these prerequisites happened, CompuCom was under no contractual obligation to pay Kraft commissions and CompuCom, therefore, did not breach the Agreement.

Kraft specifically alleges that, he was terminated "a couple of days before the signing of the final paperwork" on the deals that he has labeled falsely as "Closed Deals."  (Freedberg Decl., Ex. A at ¶ 43.)  Kraft also makes clear that he does not know whether the "Closed Deals" in fact closed when he alleges that "CompuCom *may* have delivered goods and services to the buyers post [his] termination."  (*Id.* at ¶ 46.)  Moreover, Plaintiff fails to provide a "Salesforce Closed/Won date" for any of these "Closed Deals," and, thus, fails to show that he "earned and [was] eligible" for the initial commission payments when his employment was terminated as set forth in the agreement.

Kraft identifies two deals as having been withdrawn by clients. (*Id.* at ¶ 50.)  The "Withdrawn Deals" did not close, and Plaintiff concedes this fact in his Amended Complaint. (*See id.* at ¶¶ 51, 53.)  Accordingly, there is no "Salesforce Closed/Won date" for commissions on these two "Withdrawn Deals" that would deem the commissions "earned and eligible for payment" as required by the Agreement.

14

Kraft identifies one last deal to which he claims commission as the "Apollo Deal." (*Id.* at ¶ 57.) Kraft alleges that the Apollo Deal "upon information and belief, will be entered as Closed/Won into Salesforce in the near future." (*Id.*) It is clear from this allegation that, pursuant to the Agreement, commission on the Apollo Deal was not "earned," because the Apollo Deal does not have a "Salesforce Closed/Won Date . . . before [Kraft's] last day" of employment. (*See* Starnes Aff., Ex. A. at 10.)

Kraft will likely argue that CompuCom breached its agreement with Kraft by withholding commissions even though Kraft had produced a prospective client that was ready, willing and able to enter into a contract with CompuCom. This argument ignores the fact that the Agreement provides a different standard for earning commissions. Moreover, where parties enter into commission agreements that provide specific prerequisites for earning commissions, courts must apply the terms of the commission agreement, even if it different that the "procuring cause" standard. *See e.g., Srour v. Dwelling Quest Corp.*, 5 N.Y.3d 874, 875, 808 N.Y.S.2d 128 (2005) ("Although the common-law rule is that a broker who produces a person ready and willing to enter into a contract upon his employer's terms . . . has earned his commissions, the parties are free to add whatever conditions they may wish to their agreement"); (internal quotation marks and citation omitted); *Pachter v. Bernard Hodes Group, Inc.*, 10 N.Y.3d 609, 617, 891 N.E.2d 279, 861 N.Y.S.2d 246 (2008) (observing that although under common law, "a broker who produces a person ready and willing to enter into a contract upon his employer's terms . . . has earned his commissions," "it is well settled that parties to a transaction are free to depart from the common law by entering into a different arrangement"); *Beng Soon Lim v. Harvest Int'l Realty, Inc*., Index No. 08-cv-3505, 2009 U.S. Dist. LEXIS 109389, *18 (E.D.N.Y. Nov. 23. 2009). Here, the Agreement explicitly provides that an initial commission payment on a deal is only earned by a

terminated Account Executive when the "Salesforce Closed/Won date [is] on or before the Participant's last day." (Starnes Aff., Ex. A at 10.) Kraft does not plead that this prerequisite for earning commissions on any of the deals occurred; accordingly, Kraft has not pled a breach of contract and the claim must be dismissed.

Kraft appears to allege that CompuCom terminated him to avoid paying commissions. Even if this claim is true (it is not), it does not revive Kraft's breach of contract claim. The Agreement clearly contemplates that CompuCom could be responsible for paying terminated employees commissions, provided that the terminated employee closed a deal whereby the "Salesforce Closed/Won date [is] on or before the Participant's last day." (*Id.*) In other words, had Kraft: (a) closed a deal, and (b) logged the Closed/Won date into the Salesforce system prior to his termination, then CompuCom would have owed Kraft commissions even after his termination. Kraft, however, does not allege that either of these prerequisites occurred in his Amended Complaint. Kraft does not allege that he closed any deals prior to his termination, and he does not provide any "Closed/Won" dates in the Amended Complaint to determine whether they were "Closed/Won" prior to his termination on October 1, 2018. Based on these allegations, Kraft fails to trigger his right to any commissions on the October Deals, because he does not allege that any of the October Deals closed, and, in fact, concedes that none of them closed. Kraft's failure to allege that any of the October Deals closed is telling and a further indication that there was not a "Closed/Won date" in Salesforce before his termination.[10]

---

[10] Kraft's allegations also contradict the Agreement. For example, Kraft claims that he was terminated "just days before [his] commissions were to be paid out" on the October Deals (Freedberg Decl., Ex. A at ¶ 38), but he was terminated on October 1, 2018 and commissions are paid one month in arrears. (Starnes Aff., Ex. A at 4.) Thus, even if there were service orders that were "Closed/Won" in October, they would have closed after his termination of October 1, and the Agreement specifically provides that he is entitled to commissions only if the "Salesforce Closed/Won date [is] on or before the Participant's last day." (*Id.* at 8.) Moreover, any commissions on those deals would have been paid one month in arrears from the Closed/Won date—not "just days" after his termination. (*Id.* at 4.) Defendants are highlighting this for the Court as another example of Kraft's failure to acknowledge the terms of the Agreement to which he is bound.

### 2.    Kraft Is Not Entitled To Commissions On New Logo Service Orders

Kraft claims that the October Deals consist of two types of service orders—Installed Service Orders and New Logo Service Orders.  (Freedberg Decl., Ex. A at ¶ 36.)  Kraft alleges that he procured New Logo Service Orders totaling $2,730,000.  (*Id.*)  The Agreement, however, makes clear that Kraft is not entitled to receive commission until he meets the quota provided in the Agreement.  (Starnes Aff., Ex. A at 3 ("provide enhanced incentive compensation to reward those who exceed their quota").)  Under the Agreement, Kraft has a personalized quota for New Logo Service Orders of $4,000,000.  (*Id.* at App'x 2.)  Thus, Kraft's breach of contract claim for commissions on New Logo Service Orders fails based on the terms of the Agreement, because there could be no breach of the Agreement based on New Logo Service Orders that fail to meet the quota provided under the Agreement.  *See Karmilowicz*, 494 Fed. App'x at 157 (dismissing claim for breach of contract where the terms of the compensation plans did not entitle plaintiff to incentives).

In *Giugliano v. FS2 Capital Partners LLC*, Index No. 14-cv-7240, 2015 WL 5124796, *15-16 (E.D.N.Y. Sept. 1, 2015), a case involving facts similar to those presented here, the court dismissed the plaintiff's breach of contract, quasi-contract, and NYLL claims.  The court found that the plaintiff's allegations did not suffice to state a plausible claim for unpaid commissions because the plaintiff did not satisfy a contractual precondition that was necessary before a commission could be earned, namely receiving a so-called "dealer manager fee" associated with the underlying sales transaction.  *Id.* at *15.  In the absence of these important facts, the Court found that "there [was] no plausible basis to conclude that [plaintiff] 'earned' the commissions that he seeks to recover, as set forth in the Agreement."  *Id.*  Here, Kraft identifies only $2,730,000 in New Logo Services Orders, which is below the $4,000,000 threshold provided under the Agreement; accordingly, Kraft has not earned commissions on New Logo Service Orders.  Thus,

Kraft's Amended Complaint should be dismissed using the same rationale provided in *Giugliano*, which dismissed plaintiff's breach of contract, quasi-contract, and NYLL claims. *See Giugliano*, 2015 WL 5124796, *17.

### C.     Kraft's Breach Of The Implied Covenant Of Good Faith And Fair Dealing Fails

Kraft's breach of the implied covenant of good faith and fair dealing claim fails for the same reasons as his breach of contract claim.  "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also Karmilowicz*, 494 Fed. App'x at 158 (affirming dismissal of plaintiff's claim for breach of the duty of good faith and fair dealing where an express contract existed); *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (breach of the implied duty of good faith and fair dealing "is merely a reach of the underlying contract").  Kraft's claim for breach of the implied covenant of good faith and fair dealing would face the same fate under Florida law and would be dismissed.  *See Enola Contracting Servs., Inc. v. URS Group, Inc.*, No. 5:08-cv-2-RS-EMT, 2008 WL 1844612, *6 (N.D. Fl. Apr. 23, 2008) ("Simply stated, plaintiff's breach of the implied covenant of good faith and fair dealing is indistinguishable from its claim for breach of contract.  In each, plaintiff contents that it was not compensated for work performed, in breach of the subcontract and work orders.  Plaintiff has not pled a basis for recovery other than ordinary contract damages."); *Accardi v. EMS Aviation, Inc.*, No. 2:10-cv-469-ftm-36dnf, 2011 WL 13294635, *3 (M.D. Fl. Nov. 16, 2011) (dismissing claim for breach of the implied duty of good faith and fair dealing where it was based on the same facts on which the breach of contract claim was premised; specifically, alleged unpaid commissions owed under an agreement).  Here, all of Kraft's allegations arise from the claim that commissions

are allegedly owed to him under the Agreement.  Thus, if Kraft's claim for breach of implied covenant of good faith and fair dealing is redundant of his breach of contract claim and should be dismissed.

**D.    Kraft's Quasi-Contract Claims Premised On The Same Facts As The Breach Of Contract Claim Fail**

Kraft's quasi-contract claims for unjust enrichment and quantum meruit under New York law should be dismissed because they are duplicative of the statutory and breach of contract claims and arise out of the same transaction as those claims.  Under these circumstances, quasi-contract claims fail because "'quasi-contractual . . . relief is unavailable where [as here] an express contract covers the subject matter.'"  *Karmilowicz*, 494 Fed. App'x at 157 (quoting *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir. 1988); *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) ("New York law does not permit recovery in quantum meruit, however, if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim"); *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997) (dismissing claims for unjust enrichment and quantum meruit because they "are non-contractual, equitable remedies that are inapplicable if there is an enforceable contract governing the subject matter"); *Dhir v. Carlyle Group Employee Co.*, No. 16-cv-06378 (RJS), 2017 WL 4402566, *8 (2017) (dismissing quantum meruit claim to recover incentive compensation that is addressed in Kraft's employment agreement); *Barth Packaging Inc. v. Excelsior Packaging Grp.*, No. 11-cv-2563, 2011 WL 3628858, at *2 (S.D.N.Y. Aug. 16, 2011) (dismissing unjust enrichment claim because it cannot be based on work performed by Kraft pursuant to an agreement and the defendant's failure to pay its obligations under such agreement). In New York, a "[p]laintiff may only bring quasi-contract claims in addition to a breach of contract claim where there is a dispute over the existence, scope, or enforceability [of] the putative

19

contract." *Harrison v. Toptani Law Office*, No. 11 Civ. 6801 (LTS), 2012 WL 694755, at *2 (S.D.N.Y. Mar. 2, 2012) (internal quotation marks omitted).

Even if Florida law applies to these quasi-contractual claims, the same result follows. *See PNC Bank, National Assoc. v. The Fresh Diet Inc.*, Case No. 17-cv-21027-KMM, 2018 WL 3412871, *4 (S.D. Fla. Mar. 22, 2018) (dismissing unjust enrichment claim where express contracts govern the responsibilities forming the bases for plaintiff's unjust enrichment claims, because "a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter") (citing *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1332 (11th Cir. 2012); *Ocean Commc'ns, Inc. v. Bubeck*, 956 So. 2d 1222, 1225 (Fla. Dist. Ct. App. 2007) ("a plaintiff cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists"); *Williams v. Wells Fargo Bank*, No. 11-21233, 2011 WL 4901346, *6 (S.D. Fl. Oct. 14, 2011) ("Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter."); *ATA-CIF, LLC v. IECUBED, LLC*, No. 8:11-cv-603-T-33EAJ, 2011 WL 6217508, *2 (M.D. Fla. Dec. 14, 2011) (quoting *Williams v. Wells Fargo Bank*, No. 11-21233, 2011 WL 4901346 (S.D. Fla. Oct. 14, 2011) ("'Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'")). A plaintiff may "'plead in the alternative for relief under an express contract and for unjust enrichment" but only when 'one of the parties asserts that the contract governing the dispute is invalid.'" *ATA-CIF*, 2011 WL 6217508, *2 (quoting *Williams*, 2011 WL 4901346, at *6). Thus, in light of the enforceable Agreement between the parties and that the claim for unpaid commissions clearly arises from it, Kraft's claims of quantum meruit and unjust enrichment fail as a matter of law.

V.      **CONCLUSION**

For all the foregoing reasons, the Court should dismiss Kraft's Amended Complaint for

failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure.

Date:   December 5, 2019
        New York, New York

/s/ Eli Z. Freedberg
Eli Z. Freedberg
Maria Caceres-Boneau
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022.3298
212.583.9600

*Attorneys for Defendant*